Serina M. Vash
Herman Jones LLP
(NY Bar No. 2773448)
153 Central Avenue, #131
Westfield, New Jersey 07090
svash@hermanjones.com
404-504-6516

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Glenn Bruno, Derivatively on Behalf of STRONGHOLD DIGITAL MINING, INC., <br><br> Plaintiff, <br><br> v. <br><br> GREGORY A. BEARD, WILLIAM B. SPENCE, RICARDO R.A. LARROUDE, SARAH P. JAMES, THOMAS J. PACCHIA, MATTHEW J. SMITH, and THOMAS R. TROWBRIDGE, IV, <br><br> Defendants, <br><br> -and- <br><br> STRONGHOLD DIGITAL MINING, INC., <br><br> Nominal Defendant. | Case No. <br><br> 1:24-cv-798 <br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

Plaintiff Glenn Bruno ("Plaintiff"), by and through his attorneys, submit this Verified Stockholder Derivative Complaint on behalf of Nominal Defendant Stronghold Digital Mining, Inc. ("Stronghold" or the "Company") against certain officers and directors of the Company. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation, review and analysis of: (a) Stronghold's filings with the United States Securities and Exchange Commission ("SEC"); (b) Stronghold's press releases, website pages, corporate governance documents, presentations, conference calls, and other publicly disseminated information; (c) analyst reports, public records, and other publicly available information concerning Stronghold; and (d) the pleadings filed in a federal securities class action captioned as *Winter v. Stronghold Digital Mining, Inc., et al.*, Case No. 1:22-cv-2088-RA filed in the United States District Court, Southern District of New York (the "Securities Class Action").

**NATURE OF THE ACTION**

1.     This is a stockholder derivative action brought on behalf of the Company seeking to remedy breaches of fiduciary duties and other violations of the law by Stronghold's board of directors (the "Board") and certain of the Company's senior officers (collectively, the "Individual Defendants") between at least July 27, 2021 through March 31, 2022 (the "Relevant Period").  In this action, Plaintiff asserts claims for breach of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and Sections 11(f) of the Securities Act of 1933 ("Securities Act") and 21D of the Securities Exchange Act of 1934 ("Exchange Act").

2.     Stronghold is a New York-based, vertically integrated cryptocurrency mining company.

3.      Stronghold wholly owns and operates two power generation facilities in Pennsylvania, known as Scrubgrass and Panther Creek.  Stronghold operates these facilities to power its fleet of Bitcoin mining computers ("miners").

4.      At issue in this derivative action are a series of false and misleading statements contained in the Company's initial public offering ("IPO") materials concerning agreements for the purchase of miners and delivery schedules therefor that Stronghold had made with Bitcoin miner suppliers, including MinerVa Semiconductor Corp ("MinerVa"), and the Company's expected computing power, or "hash rate," that could be achieved.

5.      On July 27, 2021, the Company filed its registration statement on Form S-1 with the SEC to pursue its initial public offering ("IPO").

6.      The Company subsequently made multiple amendments to the S-1 (the "Registration Statement"), which was declared effective on October 19, 2021.

7.      On April 2, 2021, Stronghold entered into a purchase agreement with MinerVa for 15,000 MV7 miners with a total terahash equal to 1.5 million terahash.[1]  Under the contract, MinerVa was to supply the 15,000 miners at the time of Stronghold's IPO, which was completed on October 22, 2021.

8.      On October 20, 2021, Stronghold's shares began trading on the NASDAQ stock exchange under the ticker symbol "SDIG."

9.      On October 21, 2021, the Company filed its final prospectus pursuant on Form 424B4 with the SEC (the "Final Prospectus," and together with the Registration Statement, the "Offering Materials").

---

[1]  Bitcoin miners can generate trillions of hashes per second, and the hash rate of an individual miner is often represented in terahashes per second.  One terahash is equivalent to 1 trillion hashes.

10.     The Offering Materials touted the Company as having "[s]uperior access to Bitcoin miners with multiple miner procurement channels, including direct relationships with equipment manufacturers and partnerships with data center operators and other intermediaries." The Offering Materials further highlighted and purportedly confirmed certain purchase orders for the acquisition of miners from multiple providers of Bitcoin miners to demonstrate the Company's purported "ability to leverage the breadth of our relationships to quickly expand our mining capacity."

11.     However, Defendants knew at the time that these representations were made that there was no way that the delivery schedules and quantities publicized in the Offering Materials would be met. That included the first scheduled delivery, which would purportedly take place less than two weeks after the IPO.

12.     In the IPO, the Company sold approximately 7.7 million shares at $19.00 per share for total net proceeds of approximately $132.5 million.  The proceeds were purportedly going to be used for general corporate purposes, including for acquisitions of miners and power-generating assets.

13.     The Offering Materials disseminated in connection with the IPO were materially false and misleading because they included misrepresentations and omissions of then present facts.

14.     MinerVa was Stronghold's biggest supplier of miners.  Leading up to and during the IPO, Defendants communicated with MinerVa "every day" and knew that it was facing significant issues at its assembly facility in China, including power outages and restrictions that prevented miners from being assembled.  MinerVa had failed even to source the necessary components to assemble a substantial number of the ordered miners.

15.     Because of the complications communicated to Stronghold by MinerVa, Stronghold was aware that delivery of the ordered MV7 miners, according to the delivery schedule publicized in Offering Materials was not possible.

16.     As this Court noted in its August 10, 2023 Order denying the defendants' motion to dismiss the Securities Class Action: "In sum, given the power outages at MinerVa's facilities and MinerVa's belated acquisition of necessary parts for the miners, as well as that Stronghold had not yet made its final payment for the miners at the time of the IPO, Plaintiffs have plausibly alleged Stronghold could not have 'anticipated' receiving the miners according to the timeline in the Offering Materials."  MTD Order, Securities Class Action, ECF No. 77, at 19.

17.     Further, the Offering Materials falsely and misleadingly represented that each of the 15,000 MV7 miners that Stronghold had ordered from MinerVa would perform at a hash rate of 100TH/s. The Offering Materials touted that with the addition of these new miners Stronghold would be able to produce 2,100 petahashes/s by December 31, 2021. Despite its declarations to the contrary, the Company knew that the advertised 100TH/s rate was impractical as it has not yet been achieved in real-world conditions; instead, internally Stronghold anticipated that the miners would only operate at 90% efficiency, producing only 90TH/s.   In actuality, however, the MinerVa MV7 miners were plagued with faults and performance issues, with one in three of the miners being defectively non-operational and those that did function failing to perform close to even the internally anticipated rate, producing only 50 to 70TH/s.

18.     These failures led to Stronghold producing only 40% of its advertised 2,100 PH/s goal by the end of 2021.

19.     On March 29, 2022, after the market had closed, the Company announced its fourth quarter full year 2021 financial results in which it reported a net loss well below analysts'

5

expectations of $17.5 million for the fourth quarter of 2021 and a net loss of $27.3 million for the full year 2021. Regarding its performance, Stronghold's CEO admitted in an accompanying statement that "[o]ver the past few months, we have [had] significant headwinds in our operations which have materially impacted recent financial performance." Specifically, Stronghold disclosed that "MinerVa['s] deliveries have been well short of the timelines in the contract" as "to-date we have only received approximately 3,300 out of the 15,000 miners originally ordered from MinerVa that were scheduled for delivery by December, as they have continually fallen short of contractual and communicated delivery timelines." The Company maintained that while it "continues to have active dialogue with MinerVa regarding its delivery schedule and operational capabilities," and continued to be "in near constant contact" with MinerVa, the Company could not "provide an update or a timeline on future deliveries, or if the Company can expect any future deliveries" of the MinerVa miners.

20.    On this news, the Company's stock price dropped $3.28 per share, or 32%, to close at $6.97 per share on March 30, 2022, on unusually high trading volume.  Stronghold shares are currently trading at around $4.00 per share, which represents a mere 21% of the $19.00 IPO price.

21.    As Stronghold would later reveal, by March 31, 2022, it had recognized an impairment of over $12.2 million for the remainder of miners yet to be received from MinerVa.

22.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements and omissions regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that:  (1) MinerVa would not be able to complete projected deliveries

on time given that its facility in China where the miners were to be assembled was riddled with operational issues; (2) consequently, Stronghold could not achieve anticipated target hash rates; (3) the Company's recent confirmed purchase orders were not a reliable metric for imputing the Company's ability to quickly expand mining capacity; (4) the Company's ability to expand its Bitcoin mining capacity as touted in the Offering Materials was untenable; (5) as a result, the Company would likely incur substantial losses; and (6) the Company failed to maintain internal controls.

23.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

24.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

25.    Thereby, the Individual Defendants breached their fiduciary duties of loyalty and good faith and committed other violations of law by willfully engaging in the wrongdoing as alleged herein.

26.    In light of the Individual Defendants' misconduct, which has subjected the Company, its President and CEO, its former Co-Chairman, and its former CFO to being named as defendants in a federal securities class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), which recently overcame motions to dismiss, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were unjustly compensated

by the Company and/or who benefited from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

27.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Stronghold has sustained damages as described below.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a federal claim of contribution derivatively on behalf of Stronghold arising under Sections 11(f) of the Securities Act and 21D of the Exchange Act.  This Court has exclusive jurisdiction over the federal securities laws claims under Section 27 of the Exchange Act and supplemental jurisdiction over the pendent state law claims under 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

29.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who resides in this District or has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

30.     Venue is proper in this Court under 28 U.S.C. § 1391 because nominal party Stronghold maintains its principal executive offices in this District, one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Stronghold occurred in this District,

and/or defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

31.     Plaintiff is a current shareholder of Stronghold common stock. Plaintiff has continuously held Stronghold common stock since he first purchased shares before the completion of the IPO.

32.     Nominal Defendant Stronghold is incorporated under the laws of Delaware with its principal executive offices located at 595 Madison Avenue, 28th Floor, New York, New York 10022.  Stronghold's common stock trades on the NASDAQ under the symbol "SDIG."

33.     Defendant Gregory A. Beard ("Beard") has served as the Company's President, CEO, and Co-Chairman of the Board since March 2021.  Defendant Beard is a founding and managing member of Q Power LLC ("Q Power"), of which Stronghold is a subsidiary. Additionally, he currently serves as the CEO of Beard Energy Transition Acquisition Corp. (the "Beard SPAC"), a special purpose acquisition company currently in registration.  He also currently serves on the board of directors of Scrubgrass LP, the board of directors/advisors of Double Eagle Energy Holdings III, Skeena Resources Ltd., Andros Capital Partners LLC, and Parallaxes Capital, as well as the board of directors of The Conservation Fund, a non-profit focused on land conservation.  According to the Company's public filings, for the fiscal year ended December 31, 2021, Defendant Beard earned $4,582,324 in total compensation, including $230,769 in salary and $4,351,555 in options awards.  For the fiscal year ended December 31, 2022, Defendant Beard received $493,615 in total compensation.  Defendant Beard is a named defendant in the Securities Class Action.

34.     Defendant William B. Spence ("Spence") served as Co-Chairman of the Board from March 2021 until he resigned from the Board on March 29, 2023.  According to the Company's public filings, Defendant Spence has been digitally mining crypto assets since 2018 and "his experience with mining crypto assets makes him well qualified to serve on our Board." Defendant Spence is a founding and managing member of Q Power and serves on the board of Scrubgrass LP.  In 2021, Defendant Spence received $600,000 in fees earned or cash paid and $4,351,555 in options awards.  Defendant Spence is a named defendant in the Securities Class Action.

35.     Defendant Ricardo R. A. Larroudé ("Larroudé") served as Stronghold's CFO from March 2021 to May 15, 2022.  According to the Company's public filings, for the fiscal year ended December 31, 2021, Defendant Larroudé received $1,749,868 in total compensation, including $116,501 in salary, $350,000 in bonus, and $1,283,367 in option awards.  For the fiscal year ended December 31, 2022, Defendant Larroudé received $94,216 in total compensation, comprised solely of salary.  Defendant Larroudé is a named defendant in the Securities Class Action.

36.     Defendant Sarah P. James ("James") has served as a Company director since October 2021.  She is the Chair of the Nominating and Governance Committee and served as Chair of the Audit Committee during the Relevant Period.  Defendant James serves as the CFO of the Beard SPAC.  According to the Company's public filings, for the fiscal year ended December 31, 2021, Defendant James received $172,820 in total compensation, including $152,711 in option awards and $20,109 in stock awards.  For the fiscal year ended December 31, 2022, Defendant James received $148,599 in total compensation, including $53,599 in fees earned or cash paid and $95,000 in stock awards.

37.     Defendant Thomas J. Pacchia ("Pacchia") has served as a Company director since October 2021.  He serves on the Audit Committee and the Compensation Committee.  According to the Company's public filings, for the fiscal year ending December 31, 2021, Defendant Pacchia received $172,820 in total compensation, including $152,711 in option awards and $20,109 in stock awards.  For the fiscal year ended December 31, 2022, Defendant Pacchia received $137,879 in total compensation, including $42,879 in fees earned or cash paid and $95,000 in stock awards.

38.     Defendant Matthew J. Smith ("Smith") has served as a Company director since November 2021 and as CFO since April 18, 2022.  He served as Chair of the Audit Committee until he was appointed CFO.  According to the Company's public filings, for the fiscal year ended December 31, 2021, Defendant Smith received $148,574 in total compensation, including $136,346 in option awards and $12,228 in stock awards.  For the fiscal year ended December 31, 2022, Defendant Smith received $1,644,809 in total compensation, including $213,461 in salary, $300,000 in bonus, and $1,131,348 in stock awards.

39.     Defendant Thomas R. Trowbridge, IV ("Trowbridge") has served as a Company director since October 2021.  He is the Chair of the Compensation Committee and serves on the Nominating and Governance Committee.  According to the Company's public filings, for the fiscal year ending December 31, 2021, Defendant Trowbridge received $151,420 in total compensation, including $141,311 in option awards and $20,109 in stock awards.  For the fiscal year ended December 31, 2022, Defendant Trowbridge received $150,057 in total compensation, including $55,057 in fees earned or cash paid and $95,000 in stock awards.

40.     Defendants Beard, Spence, Larroudé, James, Pacchia, Smith, and Trowbridge are sometimes referred to herein as the "Individual Defendants."

41.     Defendants Beard, James, Pacchia, Smith, and Trowbridge are sometimes referred to herein as the "Director Defendants."

42.     Defendants James, Smith, and Pacchia are sometimes referred to herein as the "Audit Committee Defendants."

43.     Defendants Bear, Spence, and Larroudé are sometimes referred to herein as the "Securities Class Action Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44.     Because of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Stronghold and because of their ability to control the business and corporate affairs of Stronghold, the Individual Defendants owed Stronghold and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Stronghold in a fair, just, honest, and equitable manner. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

45.     Further, each of the Individual Defendants owed to Stronghold and the shareholders the duty of loyalty requiring that each favor Stronghold's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

46.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

47.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Stronghold were required to, among other things:

a.   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.   conduct the affairs of the Company in a lawful, efficient, business-like manner to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.   remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e. ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

48.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence

of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

49.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Stronghold and were at all times acting within the course and scope of such agency.

50.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Stronghold, each of the Individual Defendants had access to adverse, non-public information about the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violation of Section 11 of the Securities Act; (ii) conceal adverse information concerning the Company's operations, financial condition, and future business prospects; (iii) artificially inflate the Company's stock price; and (iv) enhance the Individual Defendants' Company positions and their profits and power stemming from such positions.

53.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly conceal material

14

facts, fail to correct such misrepresentations, and violate applicable laws. The actions described herein occurred under the authority of the Board, thus each of the Individual Defendants who are directors of Stronghold was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of wrongdoing, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Stronghold and was at all times acting within the course and scope of such agency.

**SUBSTANTIVE ALLEGATIONS**

**Background**

56.     Incorporated in 2021, Stronghold is a New York-based crypto asset mining company focused on mining Bitcoin. The Company also wholly owns and operates two low-cost, environmentally beneficial coal refuse power generation facilities in Pennsylvania which convert coal refuse,[2] into power used to mine Bitcoin. Due to the Company's commitment to generating its energy and managing assets sustainably, the Company purports itself to be one of the first vertically integrated crypto asset mining companies with a focus on environmentally beneficial operations.

---

[2] Coal refuse is a waste byproduct of legacy coal mining operations.

57.     Bitcoin is a cryptocurrency that can be created, or "mined" by computers solving complex cryptographic puzzles to guess a correct "hash," which results in the creation of a new Bitcoin.  The greater the computing power of a mining operator, the more likely it is to be the first to provide the correct hash and create a new Bitcoin.[3]

58.     Modern mining machines use programs designed specifically to mine cryptocurrencies and are referred to as "miners."

59.     The computing power of a mining machine is measured by how many hashes it can compute. Companies, like Stronghold, that mine for Bitcoin do so on a large scale with data centers that house numerous miners.  At any particular moment, every miner is competing for the same hash and the same Bitcoin reward.

60.     The greatest expense of such operations is the electricity used to keep miners consistently running. Thus, to successfully mine Bitcoin, miners need access to power, the internet and must be in an environment conducive to consistently running (*i.e.*, they must be protected from overheating and other elemental challenges). By locating mining operations near large power sources, companies mining Bitcoin can cut electricity costs, which is vital to a Bitcoin mining company.

61.     Because Stronghold owns and operates its power plants, the cost to mine each bitcoin should be reduced by a significant margin.  The Offering Materials indicated that the mining of each bitcoin would cost Stronghold less than $3,000.

62.     At the time of Stronghold's IPO, each bitcoin was valued at over $60,000.

---

[3] A cryptocurrency is a digital or virtual currency, generally not issued by any central governmental authority, that utilizes blockchain technology to record transactions made using the cryptocurrency in a public ledger.

**Stronghold's IPO**

63.     Before the IPO, Stronghold procured agreements with three suppliers to purchase more than 26,000 additional miners, which would add over 2,500 PH/s to mining capacity. MinerVa was one of these suppliers.

64.     In anticipation of the forthcoming IPO, Stronghold provided details about these procurement agreements in its Offering Materials, stating:

> through the execution of definitive agreements since April 1, 2021 with three suppliers to purchase approximately 26,150 additional miners with a total hash capacity equal to over 2,500 PH/s. Approximately 72% of these miners are scheduled to be delivered in 2021, with the next batch scheduled for delivery in October 2021, 21% are scheduled to be delivered in the first quarter of 2022, and the remaining 6% are scheduled to be delivered during the remainder of 2022.

65.     On July 27, 2021, the Company filed a Registration Statement on Form S-1, which it amended several times.  On October 19, 2021, the Company filed its final amendment to the Registration Statement with the SEC on Form S-1/A.  The Registration Statement was declared effective by the SEC on the same day.

66.     On October 21, 2021, the Company filed its corresponding Prospectus on Form 424B4 with the SEC.

67.     On October 20, 2021, shares of the Company's Class A common stock began trading on the NASDAQ Global Market under the ticker symbol "SDIG." During the IPO, Stronghold sold 7,690,400 shares of Class A common stock for $19.00, per share. The IPO generated approximately $132.5 million in proceeds.

68.     As of October 20, 2021, Stronghold possessed "approximately 3,000 miners" with a combined total hash rate capacity of 185 PH/s. These miners were manufactured by Bitmain Technologies Ltd., Canaan Creative, Inc., and MicroBT Electronics Technology Co., Ltd.

**MinerVa's Failure to Deliver**

69.    On April 2, 2021, the Company entered into a purchase agreement with MinerVa, a cryptocurrency miner manufacturer. Under this agreement, MinerVa would provide the Company with 15,000 MV7 cryptocurrency miners for $73,387,500 (the "Purchase Agreement"). These MV7 miners would provide Stronghold with an additional 1.5 million TH/s.

70.    Under the Purchase Agreement, the Company would pay MinerVa for these miners in three installments.  The first two installments were paid in April and June of 2021, comprising of 80% of the purchase price, or $58.7 million.

71.    The third, and final installment was to be paid "one month before the shipping date."

72.    The Purchase Agreement specified the following shipment schedule for the MV7 miners:

        a.   at least 2500 miners by October 31, 2021;

        b.   at least 5000 miners by November 30, 2021;

        c.   at least 5000 miners by December 31, 2021;

        d.   and any remaining 2,500 miners by January 31, 2022.

73.    Stronghold's Offering Materials emphasized the Company's total hash rate as a main selling point to attract investors, stating that while it currently operated approximately "3,000 crypto asset mining computers" with a hash rate of approximately "185 PH/s," the existing purchase agreements would bring the Company's total hash rate to 2,100 PH/s by the end of 2021 and to over 8,000 PH/s by the end of 2022.

74.     This staggering rate of growth is primarily based on the acquisition of the miners from MinerVa. With each of the 15,000 miners, per the Offering Materials, purporting to output 100 TH/s, this addition would represent an addition of 1.5M TH/s.

**Stronghold Misleads Investors About MinerVa Miners Pre-IPO**

75.     Between September 2021 and continuing through at least October 2021, power outages and shut-downs plagued manufacturing plants across China, where MinerVa manufactures its MV7 miners. These shutdowns were the result of increased demand for Chinese-manufactured products post-COVID-19.

76.     Manufacturing plants were forced to shut down for hours or slow down operations as a response.

77.     Defendants knew about these shut downs before and during the IPO, as well as when the delivery and payment schedules were published in Offering Materials. However, Defendants failed to inform the investors.

78.     Although the delivery schedule outlined in the Offering Materials stated that MinerVa would ship a minimum 7,500 MV7 miners by the end of October 2021, at the time of the IPO, the Company had not yet received a *single* miner from MinerVa.

79.     By November 2021, Stronghold had only received 240 miners from MinerVa. Of the mere 240 miners, a significant portion were highly defective or not operational.

80.     MinerVa's shipment delays were knowable at the time of the IPO because the Individual Defendants followed the progress of the MinerVa MV7 production and assembly extremely closely given how critical it was to Stronghold's business.  Indeed, 15,000 of the 26,150 miners Stronghold had under purchase agreement at the time of the IPO, or approximately 53%,

were to be supplied by MinerVa.  As Defendant Beard acknowledged during a November 30, 2021 conference call, he and Stronghold's executive leadership "talk to MinerVa every day."

81.      At all relevant times, the Defendants were aware of how many miners the company had received, as well as those miners' poor quality.

82.      During the October 2021 visit to Panther Creek, the Company's management acknowledged that MinerVa did not have many miners on hand and would be unable to comply with the delivery schedule as indicated in the Offering Materials.

83.      This was reiterated by Defendant Beard on a November 30, 2021 call with investors where he stated that MinerVa "still need[ed] to figure out their assembly issues."

84.      Despite their explicit knowledge that MinerVa could not meet the agreed upon schedule for delivery, well before the IPO, Defendants falsely stated on October 21, 2021, that MinerVa would deliver 2,500 of the expected 15,000 miners by October 31, 2021.

85.      Defendant's knowledge of MinerVa's inability to deliver per the stipulated schedule is evidenced by the fact that Stronghold had still not yet paid the final 20% of the purchase price as set out by the Purchase Agreement – despite this payment being due *one month* before the scheduled date of delivery for the miners.

86.      Further evidence of the Defendant's knowledge of MinerVa's inability to maintain the schedule may be ascertained from the fact that under the Purchase Agreement and as provided in the Offering Materials, Stronghold was responsible for paying the shipping fees on miners sent by MinerVa. Therefore, at the time of the IPO, Defendants would have known (or recklessly disregarded) that Stronghold had not yet paid for shipments of miners as of the IPO and, as such, there was no way that the Company would receive the quantity of miners promised by October 31, 2021.

**Stronghold Continues to Mislead Investors About MinerVa Miners Post-IPO**

87.     On November 8, 2021, just twelve business days after the IPO Prospectus was filed, Stronghold filed a report on Form 8-K with the SEC disclosing that Stronghold had yet to receive any miners from MinerVa and that only 240 miners were on the way.

88.     The same day, Stronghold issued a press release on its website announcing that it had closed on the acquisition of the Panther Creek facility, and the related services agreement, but did not mention the receipt of miners from MinerVa or their quantity at all.

89.     On November 30, 2021, Stronghold filed a Form 8-K with the SEC attaching a press release issued that same day announcing the Company's third quarter 2021 financial results. The press release, which was issued after stock market trading hours, cited the following highlights:

> **Third Quarter and Recent Operational and Financial Highlights**
>
> •       Removed approximately 106,000 tons of coal refuse and returned approximately 64,500 tons of beneficial use ash to waste coal piles during the quarter, facilitating the remediation of these sites
> •       Closed upsized initial public offering ("IPO") on October 22, 2021, generating net proceeds of approximately $132.5 million
> •       Closed acquisition of Panther Creek Plant on November 2, 2021, increasing owned power generation capacity to approximately 165 megawatts ("MW")
> •       As of November 29, 2021, has received nearly 6,000 miners with total hash rate capacity of approximately 470 petahash per second ("PH/s") and remains on track to achieve its hash rate capacity goal of 8,000+ PH/s by the end of 2022
> •       Pro forma cash and cash equivalents as of September 30, 2021 was approximately $104.2 million, as adjusted for net proceeds from the IPO, closing of the Panther Creek Plant acquisition, and deposits paid in relation to announced miner purchases.

90.     The Company also stated in the press release that:

> As of September 30, 2021, the Company had approximately 3,000 miners deployed with total hash rate capacity of approximately 185 PH/s. As of November 29, 2021, the Company has purchased or installed approximately 45,000 miners with total hash rate capacity of approximately 4,390 PH/s…. Since the end of the third quarter, Stronghold

> has received nearly 3,000 miners, including the first 240 MV7 miners from MinerVa, and the Company expects to have over 500 MinerVa miners installed by the end of the week, with shipments ramping up for the 15,000-miner order. Performance for these machines has been in line with expectations.

91.    The same day, November 30, 2021, the Company held an earnings call after trading closed. During this call Defendant Beard stated:

> we are actively receiving commercial quantities of miners under our agreements with MinerVa …. With respect to MinerVa, we have 240 MV7 miners plugged in currently and expect to have over 500 plugged in by the end of this week. We had expected all 15,000 MinerVa miners to be received late this year or early next year, and this is still the case.

92.    During the same call, Defendant Larroudé reiterated Defendant Beard's sentiments, assuring investors that the Company had been and was in "consistent contact with MinerVa":

> At the end of the third quarter, we had about 3,000 miners employed with total hash rate capacity of roughly 185 petahash. From the end of the quarter through November 29, we received nearly 3,000 additional miners with total hash rate capacity of approximately 285 petahash, more than doubling our hash rate capacity in less than 2 months.
>
> These miners include 240 MinerVa MV7 miners, and we expect to have by over 500 by the end of the week. … We're in consistent contact with MinerVa … and expect to receive the balance of the miners under these agreements over the next few months.

93.    After Defendant Larroudé concluded his statements, an analyst from Riley Securities, Inc., inquired as for additional details pertaining to the MinerVa miners, and the alleged "ramp up" of shipments to be received. In response Defendant Beard confirmed the delays and attributed them to delays in assembly, as well as the power outages in China, stating:

> So I don't want to, beyond my quarterly conference call, sort of make representations on behalf of MinerVa. I'll tell you what they have told us, and we believe them, is that their constraint comes largely from having an assembly center that has been part of an industrial park that has experienced power curtailments, which – that's concerning.
> In spite of that, they're still shipping miners to us and hopefully others, and they're now starting to show up. And they're working as expected on the spec that we paid for. And in fact, today, I posted on – I'm aware that there are rumors out there saying, "Hey, is Minerva -- are they going to be able to deliver all of this? Does this company really even exist?" So for

that reason, I posted on LinkedIn pictures of one of our StrongBoxes full of MinerVa miners that have been delivered and/or running. And hey, we'll be doubling that quantity by the end of the week -- this week actually. And so they're coming.

So the curtailment of power impacted one facility. We talk to MinerVa every day. We are aware of the other facilities that they are trying to move their assembly operations to and believe that they will be successful in ramping up assembly outside of Mainland China to be able to produce, I would say, industrial quantities of these machines.

I can tell you that -- I don't think they've done it yet. So I think right now, we're still – it's still dribs and drabs out of that one facility. But because we have -- we are not passive in this effort. We're actively trying to both understand and push and help MinerVa with that assembly issue.

So it's a – it's a pretty bad fraud if they're actually shipping miners. So that's the - and I'm aware – I've been made aware of what some folks are saying about MinerVa. Again, not representing them, but – and it's certainly not issue free. But we do believe that we're going to get all 15,000 miners in the first quarter of next year. For that to happen, they still need to figure out their assembly issues. But having helped them and worked with them, I think they're going to do it. [Sic.]

94.     Further, Defendant Beard acknowledged that contrary to the prior statement that Stronghold was taking delivery of 15,000 miners in 2021, the Company would receive only 1,500 miners from MinerVa in 2021:

I think also, just from your modeling standpoint and ours, like we're presuming that we get only 1,500 of these miners by the end of this year. So it is not like we're assuming that we're going to get 15,000 and our growth is going to be limited by MinerVa. They are a small part of the picture this year. And overall, I think they're going to be a relatively small part of our story. They're a part of it because I think we got what we feel like a good deal on those machines. But obviously, them being late, that hurts us.

So it's not a position that we want to be in, but we are reliant on a single producer of these things. I'm not sure what your question was, but that was -- I want to make sure I said those things.

95.     Plaintiff brings this action derivatively for the benefit of the Company to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

96.     Also on the same day, November 30, 2021, the Company filed its Form 10-Q for the Third Quarter ending September 30, 2021, which asserted that the Company paid the final

23

MinerVa deposit of $14,667,500 on October 26, 2021, even though it had received no MinerVa miners to date, but again stated that "Delivery of [MinerVa] miners are per the timeframes discussed in Note 8" (which repeated the timeframes outlined in the Offering Materials).

**Stronghold's Misrepresentations Come to Light**

97.     On January 6, 2022, Stronghold filed a Form 8-K with the SEC ("January 6, 2022 Form 8-K") indicating that, due to a lack of MinerVa MV7 miners, it had been forced into an amendment of the WhiteHawk Financing Agreement in exchange for payment of an Amendment Fee of $250,000.   The Form 8-K noted that the WhiteHawk Financing Agreement originally contained terms requiring all of "the 15,000 miners being purchased under a purchase agreement (the "MinerVa Purchase Agreement") with MinerVa Semiconductor Corp. ("MinerVa") be delivered on or before December 31, 2021." Failure to accept delivery by December 31, 2021 "would result in an Event of Default" which would "give WhiteHawk the right to accelerate all amounts then outstanding under the WhiteHawk Financing Agreement" and "could only be cured by a waiver from WhiteHawk."

98.     The Form 8-K admitted that "MinerVa did not deliver all of the miners under the MinerVa Purchase Agreement by the December 31, 2021 deadline." Instead, the Company had only received a few of "1,000 of the miners to date," though Stronghold continued to assure shareholders that the miners could still "arrive by the end of March 2022" and that the WhiteHawk Financing Agreement had been amended to extend the deadline for delivery to April 30, 2022.

99.     On March 29, 2022, after the market closed, Stronghold announced its fourth quarter and finalized 2021 financial results in a press release filed with the SEC on Form 8-K.   The Company reported total revenues of $17 million. This figure represented a net loss of $0.52 for the fourth quarter, below analyst estimates of $0.04 earnings per share.

100.     The March 29, 2022 press release revealed to investors and the public what the

Individual Defendants had known for some time stating in relevant part:

> "Over the past few months, we have faced significant headwinds in our operations which have materially impacted recent financial performance and have led us to reassess our near-term growth plans. We no longer believe targeting 8.0 EH/s by the end of 2022 is achievable, given the current circumstances, and we will focus on installing and optimizing the performance of the miners that we have already ordered while maximizing our financial flexibility."

> "Specific to our contract with MinerVa, deliveries have been well short of the timelines in the contract and subsequently communicated to us by MinerVa. We are continuously evaluating all means of extracting value because of this shortfall."

> As of December 31, 2021, Stronghold had received approximately 14,700 miners with total hash rate capacity of 1.3 EH/s, of which more than 8,000 miners were hashing over 0.8 EH/s. For the fourth quarter of 2021, Stronghold averaged a hash rate of approximately 0.3 EH/s, and, for the first quarter of 2022, the Company estimates it will average a hash rate of approximately 0.9 EH/s. As of March 24, 2022, the Company had received approximately 25,200 miners with total hash rate capacity of approximately 2.3 EH/s, of which approximately 20,500 miners were hashing approximately 1.9 EH/s.
> To date, Stronghold has only received approximately 3,300 of the total 15,000 miners ordered from MinerVa.... Stronghold continues to have active dialogue with MinerVa regarding its delivery schedule and operational capabilities, but the Company does not have sufficient information from MinerVa to provide an update or a timeline on future deliveries, or if the Company can expect any future deliveries. Additionally, the performance of MinerVa's miners has been below expectations, with hash rates ranging from 50% to 70% of the expected capacity, compared to 90%+ for a standard performing machine. The Company is actively working to improve MinerVa miner performance and evaluating all appropriate avenues to extract value from the MinerVa miners and contract. The most recent batch of MinerVa machines are showing improved performance; however, the Company is evaluating all available remedies at its disposal.

101.     It was also announced that the Company had worked with WhiteHawk to amend

the WhiteHawk Financing Agreement "to remove all MinerVa miners from the collateral package."

Further, in its Form 10-K, Stronghold admitted that MinerVa had "only delivered approximately

3,200" and that the Company did "not know when the remaining MinerVa miners would be

delivered, if at all."   The Company also announced that, because it did not know if the miners

would ever arrive, that "we may write off some or all of the approximately 12,000 undelivered MinerVa miners."

102. In its Investor Presentation materials filed with the March 29, 2022 Form 8-K, the Individual Defendants acknowledged the negative impact of the concealed MinerVa miner delivery delays. Specifically, the Individual Defendants announced that MinerVa's failure to deliver resulted in a loss of approximately "$30-35m in estimated revenue missed through March 2022."

103. The same day, the Company held a meeting in connection with these financial results. During this meeting, Defendant Beard cited "two key factors that have negatively impacted [Stronghold's] operations and near-term growth trajectory:"

> [T]here are two key factors that have negatively impacted our operations and near-term growth trajectory. We estimate these factors collectively created a $40 million to $45 million reductions in cash flow to date, relative to our base case plan. As many of you know, we placed an order for miners with a miner manufacturer called MinerVa in 2021. Additionally, MinerVa presented a compelling value proposition for the price of roughly $50 per terahash, a significant discount to prevailing market rates.
>
> However, to-date we have only received approximately 3300 out of the 15,000 miners originally ordered from MinerVa that were scheduled for delivery by December, as they have continually fallen short of contractual and communicated delivery timelines. Based on what we know today in our recent communications with MinerVa, we cannot provide any definitive guidance after the timing of future deliveries. We are evaluating all appropriate avenues to extract value from MinerVa and also proactively removed all MinerVa and miners from the collateral-based supporting our equipment financing agreements.

104. Defendant Beard also acknowledged in his opening statement of this meeting that the Company continued to be "in near constant contact" with MinerVa regarding the miner deliveries. Indeed, he stated that "we probably talk[ed] to [MinerVa co-founder] Mar[c] Ma on an either daily basis by phone or by text," and included that "[h]e's been with us on site in

Pennsylvania, for probably ten days in the past of the past 30 [sic]."

105.    Notwithstanding, Defendant Beard acknowledged that "MinerVa has been unreliable in hitting their projected dates thus far, and we are not confident in their ability to deliver the remaining miners on any time frame . . . ."

106.    Further, Defendant Beard acknowledged during the March 29, 2022 earnings meeting that, even the few miners the Company had received from MinerVa to date "haven't proven reliable."

107.    Per Stronghold's first quarter Form 10-Q filed with the SEC on May 16, 2022, "[a]s a result" of MinerVa's delivery failures, "an impairment charge totaling $12,228,742, was recognized on March 31, 2022." This clearly indicates that the Company, at least as of the date of the Form 10-Q filing, expected no further MinerVa miner deliveries.

108.    The March 29, 2022 press release also admitted that because of MinerVa's failure to deliver miners, the Company's total hash rate was significantly less than it had touted in the Offering Materials.  While the Offering Materials represented the miners would generate a total output of 2,100 PH/s by the end of 2021, the press release revealed that as of December 31, 2021 Stronghold had only 8,000 miners "hashing over 0.8 EH/s," or just 800 PH/s.  The press release added that "[f]or the fourth quarter of 2021, Stronghold averaged a hash rate of approximately 0.3 EH/s," which equates to only 300 PH/s.

109.    This March 29, 2022 filing also contained another critical admission from the Individual Defendants.  While the Individual Defendants pointed to delays in the MinerVa MV7 miners as a reason why Stronghold's total hash rate underperformed, they also acknowledged for the first time another contributing factor:  that the initial figure of 100 TH/s per MinerVa MV7 miner, as reported in the Offering Materials, was unachievable.

110.    In describing how "the performance of MinerVa's miners has been below expectations," the press release explained that the MV7 miners were exhibiting hash rates "ranging from 50% to 70% of the expected capacity, compared to 90%+ for a standard performing machine."

111.    This statement was the first time the Individual Defendants had admitted that Stronghold had all along only expected the MinerVa MV7 mining machines to operate at 90% of the 100 TH/s hash rate that had been touted in the Offering Materials.  Moreover, the Individual Defendants had only revealed their internal expectation of 90%, or 90 TH/s per MV7 miner, to mitigate the fact that many of the MinerVa miners were defective and were only operating at 50 to 70% of the 100 TH/s capacity they had publicized in the IPO, or 50 PH/s to 70 PH/s.

112.    Had the Individual Defendants applied their expectation of 90% hash to their hash rate projections for the 15,000 MV7 miners stated in the Offering Materials, the actual expected total hash rate for the 15,000 miners would have been around 1,350 PH/s, short of the 1,500 PH/s figure stated in the Offering Materials.

113.    On March 30, 2022, as a direct result of this news, Stronghold's stock price fell as much $3.28 per share, or 35%, to close at $6.97 per share that day, on trading volume of 6,192,200 shares, almost ten times the trading volume of 632,200 shares on March 28, 2022.

114.    On April 14, 2022, Stronghold announced that its CFO, Defendant Larroudé, who had served as Stronghold's top finance executive since the Company's IPO, would be "leaving the Company to pursue other business interests" by May 15, 2022.

**Investors Respond - The Securities Class Action**

115.    On April 14, 2022, a purchaser of Company stock filed the Securities Class Action complaint in this Court against Stronghold, Defendants Beard, Larroudé, and Spence, and nonparty

underwriters Riley Securities, Inc., Cowen and Company, LLC, Tudor, Pickering, Holt & Co. Securities, LLC, D.A. Davidson & Co., Compass Point Research & Trading, LLC, and Northland Securities, Inc.

116.    On August 10, 2023, the Court denied in part the defendants' motion to dismiss the Securities Class Action ("MTD Order").  All the claims survived except for Section 12(a)(2) claims made by one plaintiff whom the Court found lacked standing to pursue those claims.

117.    As the Court noted in its MTD Order, "given the power outages at MinerVa's facilities and MinerVa's belated acquisition of necessary parts for the miners, as well as that Stronghold had not yet made its final payment for the miners at the time of the IPO, Plaintiff has plausibly alleged Stronghold could not have 'anticipated' receiving the miners according to the timeline in the Offering Materials."  MTD Order, Securities Class Action (ECF No. 77) at 19. Accordingly, plaintiff has "plausibly allege[d] that Stronghold's statement that it 'anticipated' the delivery of miners described in the Offering Materials was materially false or misleading at the time of the IPO."  *Id.* at 15.

## DAMAGES TO STRONGHOLD

118.    As a result of the Individual Defendants' wrongful conduct, Stronghold disseminated false and misleading statements and omitted material information to make such statements false and misleading when made.  The improper statements have devastated Stronghold's credibility.  Stronghold has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

119.    As a result of the Individual Defendants' misconduct, Stronghold has sustained damages, including, but not limited to, costs and expenses incurred from having to defend and possibly settle the Securities Class Action.

120.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Stronghold's market capitalization has been substantially damaged. Specifically, Stronghold's shares are currently trading at around $4.00 per share, which is more than a 75% decline from the $19.00 IPO price.

121.    Moreover, these actions have irreparably damaged Stronghold's corporate image and goodwill.  For at least the foreseeable future, Stronghold will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Stronghold's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE ALLEGATIONS

122.     Plaintiff brings this action derivatively for the benefit of the Company to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

123.    Plaintiff is an owner of Stronghold common stock and was an owner of Stronghold common stock at all times relevant hereto.

124.    Plaintiff will adequately and fairly represent the interests of Stronghold in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## PRE-TRIAL DEMAND IGNORED

125.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

126.    At the time of filing of this action, the Board consists of the following seven individuals: Defendants Beard, James, Pacchia, Smith, Trowbridge (the "Director Defendants")

and nonparties Indira Agarwal and Thomas Dohtery (collectively with the Director Defendants, the "Directors").

127.    The Company and Director Defendants were served a pre-suit demand letter on May 15, 2023.

128.    As of the time of filing of this Complaint, the Company has yet to file any action against any of the defendants herein or even respond substantively to Plaintiff's pre-suit demand letter.

## CLAIM I

### Against Individual Defendants for Breach of Fiduciary Duty

129.    Plaintiff incorporates by reference and realleges every allegation set forth above, as though fully set forth herein.

130.    The Individual Defendants owe the Company fiduciary obligations.  Because of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligations of good faith, fair dealing, loyalty, and due care.

131.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty.

132.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Stronghold.

133.    In breach of their fiduciary duties owed to Stronghold, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that:

a.  MinerVa would not be able to complete projected deliveries on time given that its facility in China where the miners were to be assembled was riddled with operational issues;

b.  consequently, Stronghold could not achieve anticipated target hash rates;

c.  the Company's recent confirmed purchase orders were not a reliable metric for imputing the Company's ability to quickly expand mining capacity;

d.  the Company's ability to expand its Bitcoin mining capacity as publicized in the Offering Materials was untenable;

e.  as a result, the Company would likely incur substantial losses; and

f.  the Company failed to maintain internal controls.

As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

134.   The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

135.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

136.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that

they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Stronghold's securities.

137.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

138.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

139.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Stronghold has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

140.   Plaintiff, on behalf of Stronghold, has no adequate remedy at law.

## CLAIM II

### Against Individual Defendants for Unjust Enrichment

141.   Plaintiff incorporates by reference and realleges every allegation set forth above, as though fully set forth herein.

142. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Stronghold.

143. The Individual Defendants either benefited financially from the improper conduct or received bonuses, option awards, stock awards, or similar compensation from Stronghold that was tied to the performance or artificially inflated valuation of Stronghold, or received compensation that was unjust taking into account the Individual Defendants' unlawful and bad faith conduct.

144. Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, including from benefits and other forms of compensation, such as any performance based or valuation-based compensation, acquired by the Individual Defendants during the relevant period due to their unlawful conduct and breach of fiduciary duties.

145. Plaintiff, on behalf of Stronghold, has no adequate remedy at law.

## CLAIM III

### Against Individual Defendants for Gross Mismanagement

146. Plaintiff incorporates by reference and realleges every allegation set forth above, as though fully set forth herein.

147. The misconduct of the Individual Defendants, alleged herein, constituted a gross abuse of their ability to control and influence the Company, for which they are legally responsible.

148. As a direct and proximate result of the Individual Defendants' abuse of control, Stronghold has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

149.    Plaintiff, on behalf of Stronghold, has no adequate remedy at law.

## CLAIM IV

### Against Individual Defendants for Abuse of Control

150.    Plaintiff incorporates by reference and realleges every allegation set forth above, as though fully set forth herein.

151.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Stronghold, for which they are legally responsible.

152.    As a direct and proximate result of the Individual Defendants' abuse of control, Stronghold has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

153.     Plaintiff on behalf of Stronghold has no adequate remedy at law

## CLAIM V

### Against Individual Defendants for Waste of Corporate Assets

154.    Plaintiff incorporates by reference and re-alleges every allegation set forth above, as though fully set forth herein.

155.    As a result of the unlawful conduct alleged herein, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Stronghold to waste valuable corporate assets, to incur many millions of dollars of legal liability as well as substantial cost to defend unlawful actions, as well as to lose financing from investors and business from future customers who no longer trust the Company or its offerings.

156.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

157.    Plaintiff on behalf of Stronghold has no adequate remedy at law.

## CLAIM VI

### Against Securities Class Action Defendants
### Under §11(f) of the Securities Act and §21(D) of the Exchange Act

158.    Plaintiff incorporates by reference and realleges every allegation set forth above, as though fully set forth herein.

159.    Stronghold, along with the Securities Class Action Defendants (Defendants Beard, Spence, and Larroudé) are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

160.    Should the Company be found liable in the Securities Class Action for these violations of the federal securities laws, that liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers of Stronghold.

161.    Federal law provides Stronghold with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

162.    The Offering Materials, issued by the Securities Class Action Defendants, in connection with the Company's IPO contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

163.    The Company, as the issuer of the shares issued during the IPO, is strictly liable to the plaintiffs in the Securities Class Action, for misstatements and omissions in the Offering Materials.

164.    The Securities Class Action Defendants, because of their control and authority as officers of the Company, were able to and did, directly and/or indirectly, exercise control over the

business and corporate affairs of Stronghold, including the wrongful acts complained of herein and in the Securities Class Actions.

165.    Accordingly, the Securities Class Action Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates an implied private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

166.    Therefore, Stronghold is entitled to receive appropriate contribution or indemnification from the Securities Class Action Defendants for damages resulting from their unjust and bad faith conduct.

## CLAIM VII

### Against Individual Defendants for Aiding and Abetting

167.    Plaintiff incorporates by reference and reallege every allegation set forth above, as though fully set forth herein.

168.    All of the Individual Defendants acted and are acting with knowledge of, or with reckless disregard to the fact that the Individual Defendants are in breach of their fiduciary duties to Stronghold and have participated in a conspiracy in breach of fiduciary duties.

169.    In the commission of the wrongful acts alleged herein, each of the Individual Defendants has pursued or joined in the pursuit of, a common course of conduct.  The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective fiduciary duties.

Collectively, and individually, the Individual Defendants initiated and followed a course of conduct that:

      a.     violated federal securities laws;

      b.     authorized corporate actions to serve their interests rather than the interests of the Company and its shareholders;

      c.     misrepresented material facts about the Company, its financial condition, and business prospects;

      d.     prevented the disclosure of material information necessary to make statements complete and accurate; and

      e.     failed to implement and maintain an adequate system of internal controls and corporate governance practices.

170.    The purpose and effect of this conspiracy, common enterprise, and common course of conduct was, primarily, to disguise the Individual Defendants' violation of law, such as federal securities law and breaches of the Individual Defendants' fiduciary duties.

171.    Each Individual Defendant played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

172.    Each Individual Defendant aided, abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a)  Declaring that Plaintiff may maintain this derivative action on behalf of Stronghold and that Plaintiff is the proper and adequate representative of the Company;

b)  Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Stronghold;

c)  Awarding the total amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and violations of the federal securities laws;

d)  Directing Stronghold to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Stronghold and its stockholders from a repeat of the damaging events described herein, including, but not limited to,

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions;

e)  Awarding to Stronghold restitution from the Individual Defendants, and each of them;

f)  Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

g)  Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: February 2, 2024                    Respectfully Submitted,


                                           */s/ Serina M. Vash*
                                           Serina M Vash
                                           Herman Jones LLP
                                           (NY Bar No. 2773448)
                                           153 Central Avenue, #131
                                           Westfield, New Jersey  07090
                                           svash@hermanjones.com
                                           404-504-6516


                                           John C. Herman
                                           Herman Jones LLP
                                           (Ga. Bar No. 348370)
                                           (Pro Hac Vice to be filed)
                                           3424 Peachtree Road, N.E.
                                           Suite 1650
                                           Atlanta, Georgia 30326
                                           jherman@hermanjones.com
                                           404-504-6500

                                           *Counsel for Plaintiffs*


                             +

40